**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

v.                                                                    **CRIMINAL ACTION NO. 4:22-cr-79**

**WARREN W. MAXWELL,**

**Defendant.**

### *MEMORANDUM OPINION AND ORDER*

Before the Court is Warren Maxwell's ("Defendant" or "Maxwell") Motion to Suppress ("Motion"). ECF No. 16 A hearing on the Defendant's Motion was held on February 8, 2023. ECF No. 26; Hearing Transcript ("Tr."), ECF No. 27. The Court has reviewed the parties' pleadings. ECF Nos. 17, 19, 26. For the reasons set forth below, the Defendant's Motion is **GRANTED.**

### I.    PROCEDURAL HISTORY

On October 12, 2022, the Defendant was charged in a one-count indictment with Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1). ECF No. 1. This charge arose from an attempted traffic stop of the Defendant that led to his arrest in front of his home. On December 16, 2022, the Defendant timely filed the instant Motion to Suppress. ECF No. 16. On December 30, 2022, the Government filed a memorandum in opposition to the Motion. Gov't's Mem. in Opp'n, ECF No. 17 ("Resp. Opp."). On January 5, 2023, the Defendant replied. Def.'s Reply, ECF No. 19.

### II.    FACTUAL FINDINGS

The following factual background is based on the Defendant's Motion to Suppress, the Government's response, and testimony from the suppression hearing. On June 29, 2022, Hampton Police Department ("HPD") Corporal K. Thacker ("Cpl. Thacker") was on duty doing basic patrol with his unit, the Community Response Team ("CRT"). Tr. at 4. Cpl. Thacker has worked for the HPD for eleven (11) years. *Id.* The CRT focuses on criminal interdiction and patrols high crime areas in Hampton, Virginia to prevent narcotics and firearm trafficking. *See id.* at 66.

At approximately 7:00 p.m., Cpl. Thacker was patrolling a private apartment complex in the North King Street and Rip Rap Road area in Hampton, Virginia. *Id.* at 5-6, 17; Resp. Opp., Ex. 1 at 1. While patrolling the apartment's parking lot, Cpl. Thacker's attention was drawn to a parked vehicle that appeared to be unoccupied by any passengers and had all its windows down. Tr. at 5-6. Cpl. Thacker testified that the apartment complex has a high rate of crime, which made him suspicious of the vehicle's windows being down and the car left unsecured. *Id.* at 6. Upon further observation, Cpl. Thacker noticed a front license plate that was improperly displayed in the vehicle's windshield. *Id.* at 5-6. Cpl. Thacker also observed an orange June 2023 registration sticker on the rear license plate, indicating that the vehicle was a rental. *Id.* at 6; Resp. Opp., Ex. 1 at 1. After conducting a DMV check, Cpl. Thacker found that the vehicle's registration had expired in October 2020, but the vehicle was not a rental. *Id.* Through the DMV check, Cpl. Thacker also learned that the registered owner of the vehicle was a female, who appeared to be wanted out of Suffolk. Resp. Opp., Ex. 1 at 1. Because the vehicle was unoccupied, Cpl. Thacker continued patrolling the area. Tr. at 6.

About thirty minutes later, Cpl. Thacker observed a vehicle driving towards the apartment complex exit. *Id.* At that time, Cpl. Thacker was stationed in a vacant lot across the street from the apartment complex. *Id.* at 20. According to Cpl. Thacker, once the vehicle came into view of Cpl. Thacker's marked patrol car, the vehicle suddenly turned into a parking space near the exit. *Id.* at 6-7. Cpl. Thacker believes that the driver parked the vehicle to avoid having to pass his marked vehicle before entering the public roadway. *Id.* at 7; Resp. Opp., Ex. 1 at 1. At that time, Cpl. Thacker observed a single Black male, later identified as the Defendant, exit and stand by the car. Tr. at 7. The Defendant was driving his girlfriend's car on the date in question. Mot. at 2. Cpl. Thacker found the Defendant's behaviors to be suspicious because he parked the vehicle but failed to enter any of the nearby apartments or walk away from the vehicle. Tr. at 7; Resp. Opp., Ex. 1 at 1. From Cpl. Thacker's vantage point across the street, Cpl. Thacker suspected but could not confirm whether the Defendant was operating the same unregistered vehicle with an improperly displayed license plate that he previously observed. *Id.* at 32-33. Therefore, Cpl. Thacker

2

drove back to the parking lot to view the vehicle's rear license plate. *Id.* at 8, 32-33. While driving back toward the Defendant, Cpl. Thacker observed the vehicle exit the parking lot and begin travelling north on North King Street. *Id.* At that time, Cpl. Thacker confirmed that the Defendant was operating the same unregistered vehicle with an improperly displayed license plate and began to follow the vehicle to conduct a traffic stop. *Id.*

Cpl. Thacker proceeded onto North King Street in pursuit of the Defendant's vehicle and advised HPD Officer Sumpter, who was also patrolling the area, of his intention to stop the Defendant for multiple traffic violations and suspicious activity. Tr. at 8, 33; Resp. Opp., Ex. 1 at 1. Officer Sumpter has worked for the HPD for five (5) years and conducts criminal interdiction with Cpl. Thacker in the Special Intelligence unit. Tr. at 53.

As the Defendant's vehicle approached an intersection with a red light, Cpl. Thacker and Officer Sumpter observed the Defendant turn left into a 7-11 parking lot before getting back on North King Street. *Id.* at 8-9, 54. Cpl. Thacker found this maneuver to be suspicious and believes that the Defendant cut through the parking lot to prevent Cpl. Thacker's police vehicle from catching up to him. Resp. Opp., Ex. 1 at 1. Officer Sumpter also observed the Defendant cut through the 7-11 parking lot and advised Cpl. Thacker that the Defendant was continuing north on North King Street. Tr. at 54. At this point, Officer Sumpter pulled behind the Defendant's vehicle and initiated her emergency lights to conduct a traffic stop of the Defendant. Resp. Opp., Ex. 1 at 2. The Defendant turned onto Langley Avenue from North King Street with both Cpl. Thacker and Officer Sumpter's police vehicles behind him.[1] *Id.* at 11-13. Once on Langley Avenue, the Defendant continued driving down the dead-end street until he reached a duplex (196 Langley Avenue). Tr. at 11; Resp. Opp., Ex. 1 at 2. The duplex has a public walkway that connects the parking lot to a concrete slab in front of two separate, apartment units with shrubs on either side. *See* Gov't's Ex. 200

---

[1] Officer Sumpter testified that she activated her emergency lights on North King Street to conduct a traffic stop of Defendant. Tr. at 63. Officer Thacker testified that he activated his emergency lights immediately after Officer Sumpter. *Id.* at 37. The parties dispute whether the officers activated their emergency lights while on North King Street or Langley Avenue. The parties also dispute whether Defendant was speeding as he turned down North King Street and later Langley Avenue, however, Defendant was not charged with a speeding violation.

– Photograph of 196 Langley Avenue. Each unit has a screen door and front door that opens immediately into the apartment unit. *See id.* 196 Langley Avenue is the apartment unit on the left side of the duplex. *Id.*; Tr. at 15.

Once in front of the duplex, the Defendant parked haphazardly in a handicapped parking spot and exited the vehicle. The Defendant began to flee on foot towards the front door of 196 Langley Avenue. Tr. at 13, 59; Resp. Opp., Ex. 1 at 2. Cpl. Thacker testified that the Defendant was holding the front waist band area of his pants with both hands as he walked swiftly to the front door of the duplex. Tr. at 45; *see* Resp. Opp., Ex. 1 at 2 (police report describing the Defendant's gait as labored and not consistent with a normal running stride). At that time, the Officers did not know whether the Defendant resided at the duplex. Tr. at 13. As the Defendant fled, Cpl. Thacker commanded the Defendant to "get back in the car" twice while pursuing the Defendant on foot. *Id.* at 13-14; Resp. Opp., Ex. 1 at 2; Gov't's Ex. 100 – Cpl. Thacker's Body Camera Footage ("Govt.'s Ex. 100") at Timestamp ("TS") 00:38-00:52; Gov't's Ex. 101 – Officer Sumpter's Body Camera Footage ("Govt.'s Ex. 101") at TS 2:30.

Both Officers testified that once the Defendant exited his vehicle, they had probable cause to arrest the Defendant for obstruction of justice, which is a misdemeanor offense. Tr. at 43-44, 64. Body camera footage shows the moment that Cpl. Thacker made physical contact with the Defendant at the front of his home. *See* Govt.'s Ex. 100 at TS 00:38-00:52; Gov't's Ex. 101 – Officer Sumpter's Body Camera Footage ("Govt.'s Ex. 101") at TS 00:42-01:00. Both officers exited their vehicles and attempt to apprehend the Defendant as he stood in the threshold of his home between his screen door and front door. *Id.* Officer Sumpter testified that the Defendant was manipulating the front door handle and attempting to open the front door when Cpl. Thacker first grabbed the Defendant. Tr. at 65.

The Defendant did not initially comply and resisted the Officers until the Defendant's mother exited the front door of their apartment and directed the Defendant to comply. *Id.* To apprehend the Defendant, the Officers took the following steps: upon reaching the front of the duplex, both Officers grabbed the Defendant's arms and attempted to pull him away from the door. Resp. Opp., Ex. 1 at 2; *see* Gov't's Ex.

4

100 at TS 00:45 – 01:00; Govt.'s Ex. 101 at TS 00:42-01:00. Both Officers commanded the Defendant to get on the ground and place his hands behind his back. *Id.* While Officer Sumpter took hold of the Defendant's left arm, Cpl. Thacker transitioned his hold, pulling the Defendant away from the home's entrance and back into the front lawn. Gov't's Ex. 100 at TS 00:45 – 01:00. As the Officers struggled to get the Defendant on the ground, Officer Sumpter administered three knee strikes to the Defendant's left thigh area in an attempt to gain compliance before grabbing onto the Defendant's legs, causing the Defendant to fall backwards on his rear end. Resp. Opp., Ex. 1 at 2-3. The Defendant then stood up and attempted to flee toward the front door of his home a second time, at which point Cpl. Thacker wrapped both his arms around the Defendant's waist and pulled him back down to the ground. *Id.* at 3. The Defendant then grabbed his mother and pulled her down to the ground with him. *Id.* At this time, the Officers were able to place the Defendant in handcuffs. *Id.*

After being handcuffed, the Defendant advised the Officers that he had previously been shot in the leg and asked for medical assistance. *Id.* The Officers called an ambulance and began conducting a search of the Defendant's person while waiting for the EMTs to arrive. *Id.* During the search, the Officers discovered a plastic bag containing approximately 1 gram of suspected cocaine, a metal house key to 196 Langley Avenue, the Defendant's wallet, and a semi-automatic firearm loaded with ammunition. *Id.* at 3-4.

At the suppression hearing, the Court heard testimony from both Cpl. Thacker and Officer Sumpter who conducted the traffic stop and seizure giving rise to the instant Motion to Suppress. The Court admitted nineteen (19) exhibits into evidence, which were submitted by both parties, including body camera footage from the Officers, maps of the Rip Rap Road area, and photographs of the Defendant's home. Cpl. Thacker testified that based on his officer experience he found the Defendant's behavior at the apartment complex to be suspicious, specifically noting the fact that: (1) the vehicle was parked with all the windows rolled down; (2) the Defendant moved the vehicle to a different parking space near the exit of the same apartment complex; (3) the Defendant did not enter any apartment unit and remained seated in the parked vehicle; and

(4) "just kind of [stood] there next to the car." Tr. at 5-7, 18. Cpl. Thacker testified that the traffic stop of the Defendant was conducted to investigate at least two traffic violations for (1) the expired registration and (2) failure to properly display the front license plate. *Id.* at 14. Later in the hearing, both Officers testified that the Defendant's decision to flee from the Officers gave them probable cause to detain the Defendant for obstruction of justice. *Id.* at 43-44, 64.

The Defendant asserts that the recovered firearm should be suppressed because it was uncovered pursuant to an unlawful seizure. Mot. at 1. The Defendant argues that the Officers trespassed onto the curtilage of his residence when they seized him in front of his home. *Id.* at 4-5. The Defendant also argues that the Officers lacked exigent circumstances to enter his curtilage without a warrant. *Id.* at 6-9. The Government contends that the Defendant was seized in a public space that did not implicate the Defendant's constitutional rights, Resp. Opp. at 7-9, and that Cpl. Thacker's warrantless seizure was justified by exigent circumstances. *Id.* at 9-11.

## III.   LEGAL STANDARD

As a general rule, the burden of proof is on the defendant who seeks to suppress the evidence. *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981). Once the defendant establishes a basis for his motion to suppress, the burden shifts to the government to prove by a preponderance of the evidence that the challenged evidence is admissible. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *United States v. Matlock*, 415 U.S. 164, 177–78 (1974).

In the course of deciding a motion to suppress, the district court may make findings of fact, as well as rulings of law. *United States v. Stevenson*, 396 F.3d 538, 541 (4th Cir. 2005). "At a hearing on a motion to suppress, the credibility of the witness and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. McKneely*, 6 F.3d 1447, 1452–53 (10th Cir. 1993) (quoting *United States v. Walker*, 933 F.2d 812 (10th Cir. 1991)); *See also Columbus-Am. Discovery Group v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 567 (4th Cir. 1995) ("In the usual case, the fact finder is in a better position to make judgments about the reliability of some forms of evidence than a reviewing body acting solely on the basis of a written

6

record of that evidence. Evaluation of the credibility of a live witness is the most obvious example.") (quoting *Concrete Pipe & Prod. of California, Inc. v. Constr. Laborers Pension Tr. for S. California*, 508 U.S. 602 (1993)).

## IV.    DISCUSSION

The Defendant's Motion to Suppress challenges the lawfulness and scope of the Defendant's traffic stop and seizure under the Fourth Amendment. The Defendant argues that his individual rights were violated when the Government entered the curtilage of his home to effectuate a *Terry* stop. Mot. at 4-5. Accordingly, the Defendant asks that the Court suppress all evidence retrieved from the Government's warrantless entry. *Id.* at 9. In response, the Government argues that the Officers had probable cause to effectuate a lawful traffic stop and seized the Defendant in a public place for a misdemeanor offense. Resp. Opp. at 6-9. Because the Defendant was not seized in the curtilage of his home, the Government argues that his arrest was lawful. *Id.* at 7-9. However, even if the Defendant was seized in his curtilage, the United States argues that the Officers did not violate Defendant's Fourth Amendment rights because exigent circumstances justified the warrantless entry. *Id.* at 9-11.

To determine whether the Defendant's Fourth Amendment rights were violated, the Court first resolves whether the Officers had a lawful basis for stopping the Defendant. In this case, the Defendant's encounter with the police originated as a traffic stop. The standard governing traffic stops, also referred to as a *Terry* stop, is well-established. The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") has held that "[b]ecause an ordinary traffic stop is more analogous to an investigative detention than a custodial arrest, [the Court] analyzes the propriety of a traffic stop using the dual inquiry announced in the Supreme Court's holding in *Terry v. Ohio,* 392 U.S. 1, 19–20 [] (1968)." *United States v. Green*, 740 F.3d 275, 279 (4th Cir. 2014); *see also, United States v. Rusher,* 966 F.2d 868, 875 (4th Cir. 1992). Accordingly, the Fourth Circuit instructs courts to consider "first whether the officer's actions were justified at their inception and second whether his subsequent actions were reasonably related in scope to the circumstances that justified the stop." *Green*, 740 F.3d at 279 (internal quotes omitted). Here, Cpl.

7

Thacker's traffic stop of the Defendant was legitimate at its inception but became unreasonable once the Officers entered the curtilage of his home.

      *a.   The Attempted Traffic Stop*

A legitimate traffic stop is justified at its inception if it is predicated on probable cause or an officer's reasonable, articulable suspicion that "criminal activity may be afoot." *Terry*, 392 U.S. at 30; *Whren v. United States*, 517 U.S. 806, 810 (1996); *see United States v. Mitchell*, 963 F.3d 385, 390 (4th Cir. 2020). Even minor traffic offenses provide probable cause to conduct a *Terry* stop. *United States v. Cuthbertson*, 2023 WL 34171, *1 (Jan. 4. 2023, 4th Cir. 2023). The Government contends that the *Terry* stop of the Defendant was lawful at its inception based on Cpl. Thacker's observations. Specifically, the Officers had probable cause to stop the Defendant for expired tags and an improperly displayed license plate, in violation of Virginia Ann. Code §§ 46.2-646 and 46.2-715. Resp. Opp. at 6-7. In addition, Cpl. Thacker articulated that his experiences and background as an officer made him suspicious of the Defendant's behavior upon noticing Cpl. Thacker's patrol car. *Id.*; Tr. at 7-8. The Defendant argues that the information available to Cpl. Thacker should have dispelled any suspicions of the Defendant because there was no indication that the Defendant was engaged in criminal activity. Def.'s Reply at 2-3. Specifically, the Defendant points to the fact that Cpl. Thacker's DMV check made it apparent that the Defendant, a Black male and the sole occupant of the vehicle, was not the female, registered owner of the vehicle. *Id.* at 3. Based on these facts, the Defendant contends that Cpl. Thacker did not have any particularized and objective basis for suspecting that the Defendant was responsible for the observed traffic infractions, which were non-moving violations.

In support of this position, the Defendant cites to the Supreme Court's decision in *Kansas v. Glover*, 140 S. Ct. 1183 (2019). In that case, the Supreme Court addressed questions of identification and reasonable suspicion after a patrolman stopped a vehicle because a record check revealed that the registered owner had a revoked driver's license. *Id.* at 1187-90. Without any facts indicating otherwise, the officer assumed that the registered owner was likely the driver of the vehicle and drew a commonsense inference that the driver was illegally operating the vehicle without a valid license. *Id.* Given these facts, the Supreme Court held

that an officer may reasonably perform a *Terry* stop to determine whether a vehicle is being operated illegally. *Id.* at 1192. However, the majority opinion tempers its decision by noting that the officer lacked information negating the inference that the registered owner of the vehicle was likely illegally operating the vehicle but in other circumstances reasonable suspicion may be dispelled if "the officer knows that the registered owner of a vehicle is an elderly man but can see that driver is a young woman." *Id.* The Defendant argues that *Glover* is relevant to this case because Cpl. Thacker's initial suspicions and inferences should have been dispelled by the information he received from the DMV check and his observations of the Defendant, a Black male who was the lone occupant of the vehicle, before he conducted the traffic stop.

The Court has considered all the circumstances, including various objective observations, Officer Thacker's police report, hearing testimony, and more localized guidance to determine whether the articulated reasons present an objective basis for suspecting the Defendant of criminal activity. Based on its review, the Court finds that Officer Thacker labelled a significant portion of the Defendant's innocent conduct as suspicious to justify the stop. Cpl. Thacker articulated several unrelated factors that even taken together fail to amount to reasonable suspicion. *United States v. Black*, 707 F.3d 531, 539 (4th Cir. 2013) (holding that the Government may not meet its *Terry* burden by patching together "innocent, suspicion-free facts"). Innocuous behaviors, such as sitting in a parked vehicle, having all the windows rolled down in the middle of the summer, pulling into a parking spot in a private apartment complex, and standing outside a vehicle rather than entering an apartment unit, do not provide a lawful basis for officers to stop motorists like the Defendant. *See* Resp. Opp., Ex. 1 at 1. Moreover, Cpl. Thacker testified that before initiating the traffic stop, he conducted a DMV check, saw a picture of the registered owner, who was a female, and knew that the vehicle was not a rental. *See* Tr. at 19; Resp. Opp, Ex. 1 at 1. Cpl. Thacker had information from the DMV check and his own objective observations to rebut his initial inferences or suspicions that the Defendant was engaged in any particular crime, such as a carjacking or drug trafficking activity. Therefore, the Court is reluctant to give credence to these articulated suspicions in light of Fourth Circuit precedent. United *States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004) ("articulated factors together must serve to

eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied.").

Notwithstanding the above, the Court finds that the first prong of the *Terry* analysis is satisfied under Virginia law. The Defendant's claims rely on the presence or absence of probable cause, which must be supported by more than Cpl. Thacker's mere suspicion but does not require evidence sufficient for a conviction. *Taylor v. Waters*, 81 F.3d 429, 434 (4th Cir. 1996); *See Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979) (explaining that probable cause to arrest exists when the "facts and circumstances within the officer's knowledge ... are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."). The Government argues that the traffic stop of the Defendant was justified at its inception because Cpl. Thacker had probable cause to stop the Defendant for operating a vehicle with expired tags and an improperly displayed license plate on a public roadway. However, the Government fails to direct the Court to any actual statutory, regulatory or code provisions that required Cpl. Thacker to stop the Defendant for operating an unregistered vehicle with an improperly displayed license plate after learning that the Defendant was not the female registered owner. The closest the Government comes to addressing this potential gap in their argument is in their questioning of Cpl. Thacker at the suppression hearing, where he testified that he had to "identify a specific person" to issue the traffic tickets and needed to issue those tickets to the operator of the vehicle for these specific violations. *See* Tr. at 52. Therefore, the fact that the Cpl. Thacker knew that the Defendant was not the female, registered owner of the vehicle was irrelevant. *Id.* at 75.

Both parties have directed the Court to review Va. Code §§ 46.2-646 and 46.2-715, which governs expired tags and the display of license plates, in evaluating the lawfulness of the Defendant's traffic stop. Va. Code. § 46.2-646 (describing Virginia's expiration and renewal of registration requirements for motor vehicles); Va. Code. § 46.2-715 ("License plates assigned to a motor vehicle ... shall be attached to the front and the rear of the vehicle"). Each statute references Virginia's Uniform Summons ("Summons"), which is a ticket issued for motor vehicle violations, and gives courts discretionary authority to dismiss the

10

Summons upon proof of compliance with each statute. *See* Va. Code Ann. §§ 46.2-646 (D) ("For any summons issued for a violation of this section, the court may, in its discretion dismiss the summons where proof of compliance with this section is provided to the court on or before the court date), 46.2-715 (same). However, the Court finds that it is Section 46.2-388 that gives officers broad authority to issue a Summons for the aforementioned traffic infractions. Va. Code. § 46.2-388 ("The Attorney General...shall approve a form for the summons to be...used by all law-enforcement officers in the Commonwealth in cases of motor vehicle law violations reportable to the Department under the provisions of §§ 46.2-383 and 46.2-383 and for other offenses charged on a summons pursuant to § 19.274." Under Section 46.2-388's cross-reference to Section 46.2-382, an officer may direct a citation to the operator rather than the registered owner of a vehicle. *See* Va. Code § 46.2-382(A)(1)(iii) (requiring courts to keep full records of every case in which a person is charged with "a violation of any ordinance...pertaining to the operator or operation of any motor vehicles, except parking regulations). Additionally, under Va. Code § 19.2-74, which references Virginia's four classes of misdemeanor offenses, an officer is directed to take the name, address and license number of the motorist in order to properly issue the Summons. *Id.*

Because Virginia law allows officers to issue Summons to the operator rather than the owner of an unregistered vehicle, Cpl. Thacker and Officer Sumpter narrowly acted within the scope of their authority when initiating their traffic stop of the Defendant. The Officers had probable cause to stop the Defendant, even though they knew that he was not the registered owner of the vehicle, because they observed the Defendant operating a vehicle with expired tags and an improperly displayed license plate. Therefore, at this stage of events, the Court finds that Cpl. Thacker had a lawful basis for initiating the traffic stop for the narrow purpose of addressing the articulated traffic infractions and identifying the Defendant. *Rodriguez v. United States*, 575 U.S. 348, 349 (2015) ("[B]eyond determining whether to issue a traffic ticket, an officer's mission during a traffic stop typically includes checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.") (citing *Delaware v. Prouse*, 440 U.S. 648, at 658–659); see also, *United States v. Rusher*, 966

11

F.2d 868, 876 (4th Cir. 1992) (holding that during a routine traffic stop, an officer "may request a driver's license and vehicle registration, run a computer check, and issue a citation.").

Next, under the second *Terry* prong, the Court must determine whether Cpl. Thacker's subsequent actions were reasonably related in scope to the traffic infractions that justified the stop. *United States v. Bowman*, 884 F.3d 200, 209 (4th Cir. 2018); *See Arizona v. Johnson*, 555 U.S. 323, 333 (2009). Once the Defendant parked his vehicle in front of 196 Langley Street, the Officers testified that they planned to arrest the Defendant for obstruction of justice based on the Defendant's failure to obey a lawful police command by disregarding their emergency lights. Tr. at 43-44, 50, 64, 66. Both Officers explained that obstruction of justice is a jailable, misdemeanor offense that includes a wide range of behavior, including disregarding an officer's signal to pull over. *Id.* at 43-44. Based on the foregoing, the Government argues that *Terry* is satisfied under the circumstances and asks the Court to find that the Officers' encounter with the Defendant was justified at its inception and throughout. Resp. Opp. at 11; See Tr. at 76.

However, the Defendant challenges Cpl. Thacker's actions and argues that his seizure, in the curtilage of his home, was not reasonably related in scope to the traffic infractions that justified the *Terry* stop. Def.'s Reply at 2-3. Although the Officers were permitted to lawfully stop and temporarily seize the Defendant's vehicle to investigate the traffic violations, the Defendant alleges that Cpl. Thacker should have ended the traffic stop to get a warrant once the Defendant exited his vehicle and attempted to enter his home. The Court agrees. For the reasons discussed in more detail below, the Court finds that the Officers infringed on the Defendant's Fourth Amendment rights once the attempted traffic stop led the Officers to the Defendant's home. Mot. at 4-9.

     b. *Defendant's seizure in front of his home*

Below the Court conducts a detailed analysis of the steps the Officers took after the Defendant exited his vehicle and fled from the police encounter. In particular, the Court considers whether the Defendant's seizure involved trespassing into the curtilage – the constitutionally protected area in front of the Defendant's residence. If the Defendant was improperly seized within the curtilage, the Government must establish that an exigency existed to justify the challenged seizure.

As a preliminary matter, the Court must determine whether Cpl. Thacker conducted a lawful seizure when he followed the Defendant to the front of his home. A person is seized under the Fourth Amendment when an officer physically "accosts an individual and restrains his freedom to walk away." *Terry v. Ohio*, 392 U.S. 1 (1966). The "application of physical force to the body of a person with intent to restrain is a seizure, even if the force does not succeed in subduing the person." *Torres v. Madrid*, 141 S. Ct. 989 (2021) (holding that an officer who shoots a person to detain her engages in a Fourth Amendment seizure). The law does not require "an actual" or "completed arrest" for there to be a legally cognizable seizure. *Id*. at 993. Here both parties agree that the Defendant was seized when Cpl. Thacker applied physical force to his body and attempted to restrain him in front of his home. *See* Mot. at 4; Resp. Opp. at 6. Because the parties agree that the Defendant was seized under the Fourth Amendment, the burden is on the Government to prove that the Defendant's seizure was lawful.

1. ***Curtilage Inquiry***

Law enforcement officers are permitted to conduct lawful arrests in a public place. In contrast, a warrantless arrest in one's home is presumptively unreasonable. *Payton v. New York*, 445 U.S. 573 (1980). At the core of Fourth Amendment principles is "the right of the people to be secure in their persons" and "the right of a man to retreat into his home and there be free from unreasonable government intrusion." *Collins v. Virginia*, 128 S. Ct. 1663, 1670 (2018). It has long been recognized that the home, for Fourth Amendment purposes, includes more than just the inside of the residence. The Fourth Amendment also extends protections to the curtilage or "the land immediately surrounding and associated with the home." *Oliver v. United States*, 466 U.S. 170 (1984). Because the curtilage is considered part and parcel of the home itself, the Fourth Amendment prohibits warrantless intrusions in such areas. *Id*. Accordingly, courts must grapple with novel questions regarding what constitutes a person's "home."

Importantly, the concept of curtilage—and the constitutional protections it affords—is not unique to single family homes; however, the scope of curtilage may be viewed differently in apartment settings. In *United States v. Jackson*, the Fourth Circuit considered whether a grass area between the public sidewalk and a private patio of an apartment was a "common area used by all residents" or an area "so intimately tied

13

to the home itself that it should be placed under the home's umbrella of Fourth Amendment protection." 728 F.3d 367, 374 (4th Cir. 2013). The Fourth Circuit considered the boundaries of the apartment's curtilage and found that it included the front patio area but did not extend beyond a twenty-foot radius of the apartment, or encompass areas commonly used by the public, like sidewalks or shared areas between apartment buildings. *See id.* Unlike the apartment's front patio, the Court found that the grass area was not curtilage because it was used by other apartment residents and located over twenty feet from the door of the defendant's apartment. *Id.*

Other circuits have also defined the boundaries of curtilage in apartment settings. In making a curtilage determination, these jurisdictions distinguished the curtilage area found immediately surrounding an apartment from those areas that were accessible to the public and could not enjoy the same constitutional protection. *See United States v. Hopkins*, 824 F.3d 726 (8th Cir. 2016) (holding that the area six to eight inches immediately in front of a townhouse's entry door was curtilage); *United States v. Burston*, 806 F.3d 1123 (8th Cir. 2015) (holding that curtilage is the area within close proximity to an apartment that is not a "common area," and finding specifically that the grassy area within six to ten inches of the defendant's apartment is considered curtilage, where the defendant made personal use of the area by setting up a cooking grill, and a bush planted in front of the window prevented close inspection by passersby); *cf. United States v. Nohara*, 3 F.3d 1239 (9th Cir. 1993) (finding no reasonable expectation of privacy in the common area hallway outside the defendant's apartment); *United States v. Acosta*, 965 F.2d 1248 (3d Cir. 1992) (same); *see also State v. Rendon*, 477 S.W.3d 805, 808 (Tex. Crim. App. 2015) (finding that the threshold at the door of an apartment home is "objectively [and] 'intimately linked to the home, both physically and psychologically,' and thus was part of the curtilage") (quoting *California v. Ciraolo*, 476 U.S. 207, 213 (1986)).

In *Florida v. Jardines*, the United States Supreme Court held that the officers conducted a warrantless search when they stood in the home's curtilage, which included the defendant's front porch, and employed a drug sniffing dog near the house. 596 U.S. 1, 5-6 (2013). The Court's decision analyzed the location, manner, and level of intrusion created by the officer's search to further define the contours of

14

curtilage. The holding in *Jardines* explains that the "boundaries of the curtilage" are understood by one's daily experience." *Id.* at 7 (citing *Oliver*, 466 U.S. at 182). For example, a front porch is a "classic exemplar of an area adjacent to the home...to which the activity of home life extends." *Id.* (internal quotations omitted).

Based on these long-established principles, the Defendant argues that *Jardines* creates a *per se* rule that the front porch of one's home is a part of the home's curtilage because it is commonly understood to be an area immediately surrounding the home. Mot. at 4-5. However, the Government argues that it is not enough to call the area outside of the Defendant's home a "front porch," and doing so does not "automatically afford it the same privacy protections afforded by the Fourth Amendment." Resp. Opp. at 7. The Government also contends that the factors outlined in *United States v. Dunn*, 480 U.S. 294, 301 (1987), not *Jardines*, should control the Court's curtilage analysis. *Id.* In analyzing the *Dunn* factors, the Government argues that the Officers seized the Defendant in a public place rather than his curtilage because the challenged area is "connected to a sidewalk that comes from the parking lot area in front of multiple residences," "shared by at least two residences," and "has no railing, fence or even a step up defining it from the sidewalk." Resp. Opp. at 7-8. For the reasons stated below, the Court finds that both *Jardines* and *Dunn* support a curtilage determination in this case.

An application of *Jardines* to the facts in this case provides strong support for a curtilage finding. The body camera footage and submitted exhibits shows the moment that Cpl. Thacker first applied physical force to the Defendant as he stands between his front door and open screen door. *See* Gov't's Ex. 100 at TS 00:45 – 01:00; Govt.'s Ex. 101 at TS 00:42-01:00. Similar to the officers in *Jardines*, Cpl. Thacker and Officer Sumpter were positioned about a foot away from the Defendant's front door, in an area surrounding his unit, when the seizure occurred. By standing in an area that immediately surrounds the Defendant's unit, the Officers were within the Defendant's curtilage.

Moreover, the *Dunn* factors provide additional support for the Court's curtilage determination. To determine the boundaries of a home's curtilage, courts are instructed to consider whether the area in question is so intimately linked to the home itself that it should be afforded Fourth Amendment protection.

*Dunn*, 480 U.S. at 301. To answer this central inquiry, the following, non-exhaustive *Dunn* factors are instructive: (1) the proximity of the area to the home; (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by people passing by." *Id.* (explaining that the curtilage doctrine does not provide "a finely tuned formula, that when mechanically applied, yields a 'correct' answer to all extent-of-curtilage questions).

Proximity is the first *Dunn* factor. The Government concedes that the area in question is in close proximity to the Defendant's apartment. Resp. Opp. at 8. The Defendant was a few inches, and likely seconds, from entering his home and there is no doubt that the front door of the Defendant's apartment is part of the home itself. Both Officers and the Defendant stood in close proximity to the Defendant's apartment unit when the seizure occurred, which strongly supports a curtilage finding. *Burston*, 806 F.3d at 1127. The second *Dunn* factor also provides some support for a curtilage determination. The second *Dunn* factor considers whether the area is intimately included within an enclosure surrounding the home. *Dunn*, 480 U.S. at 301; *See United States v. Sweeney*, 821 F.3d 893, 902 (2016) (explaining that the second factor analyzes whether the area was enclosed and intimate to a defendant's apartment itself not whether the area was within the walls of the building). The submitted exhibits show that the Officers seized the Defendant in the partially enclosed area surrounding his particular unit. *See* Gov't's Ex. 100 at TS 00:38-00:52; Govt.'s Ex. 101 at TS 00:48-01:00; Def.'s Ex. 1. This area is likely to be used daily by the Defendant and is intimate to the Defendant's apartment itself. Body camera footage and exhibits indisputably establish that the Defendant must pass through this threshold area to enter and exit his apartment unit in a distinctly personal manner. *Id.* Based on the above, the Court finds that the area in question is intimate to the Defendant's apartment itself and the second factor weighs in favor of the Defendant. The third factor analyzes the nature and use of the challenged area and provides strong support for a curtilage determination. The Government contends that this factor weighs against a curtilage finding because the area in question is open to the public and shared between the two apartments. However, a review of the record shows that the Defendant was seized directly in front of the Defendant's front door, which was an entrance that led only

16

to and directly inside of the Defendant's home. Unlike the grass area in *Jackson*, this area is not a common area that is shared among the duplex residents or open to use by members of the public. In addition, there is no indication that the other duplex residents could enter this area if the Defendant wished to exclude them by locking the screen door. Moreover, in order to lock and unlock the front door of his unit, the Defendant must open the screen door and stand in the area in question in order to secure his apartment. Because the Defendant had a particular use for the area that tied is to his apartment unit and is not shared with the individuals in the other duplex unit, the Court finds that the third factor provides support for a curtilage finding. In contrast, the fourth and final *Dunn* factor provides the least amount of support for a curtilage determination. This factor considers the steps taken by the resident to protect the area from observation by people passing by. Photographic evidence shows that the top part of the screen door provides a partial shield from the outside, allowing an individual within the apartment to speak to someone on the outside without fully opening the screen door. *See* Mot. at 4. However, there is no indication that the Defendant took steps to protect the area from observation or limit the general public from viewing his front door. Accordingly, the Court finds that the fourth factor weighs against a curtilage determination.

In considering all the *Dunn* factors together, the area immediately surrounding the Defendant's front door was within the curtilage of the Defendant's apartment. The Court has weighed the area's close proximity, nature, and intimate uses against facts showing that the area in question may at times create a functional enclosure that does not fully shield the Defendant from public observation – though neither was the front porch in *Jardines*. *See* 133 S.Ct. at 1413. Importantly, the *Dunn* factors only represent a non-exhaustive list of factors that courts must consider in making novel curtilage determinations. Here, "daily experience" also suggests that the area immediately in front of the Defendant's unit is curtilage. *Jardines*, 133 S.Ct. at 1415 (internal citation omitted). Given the body camera footage, Cpl. Thacker's position in relation to the Defendant and his apartment's front door, testimony establishing that the Defendant had his hand on the front door handle and was standing within a few inches of the door when he was seized, the Court finds that the weight of the evidence in the record favors a curtilage finding.

Although the curtilage of the Defendant's apartment unit may be limited to the area immediately surrounding the front door of his unit, this threshold area is no different than the front porch or side garden of a single-family home. *See Jardines*, 569 U.S. at 6-7 (emphasizing that curtilage protection extends to areas that are "adjacent to" and "immediately surrounding" the home, such as a "porch or side garden"). The area is afforded the same Fourth Amendment protections as the inside of the home. The Defendant was effectively in his home for Fourth Amendment purposes and the Court finds that Cpl. Thacker conducted an unlawful seizure when he seized the Defendant in his curtilage, which the Court finds here to be the area between Defendant's screen door and front door where he was seized. This conclusion does not, however, end the Court's Fourth Amendment inquiry in this case.

### 2. *Exigent Circumstances*

An officer's impermissible entry onto one's curtilage is "presumptively unreasonable absent a warrant." *Collins*, 128 S. Ct. at 1670; *Payton v. New York*, 445 U.S. 573, 586 (1980). However, the Supreme Court has recognized several well-established exceptions to this general presumption. Exigent Circumstances is the only applicable exception in this case. The exception arises when the exigencies of the situation create a compelling need for law enforcement action such that a warrantless intrusion is objectively reasonable. *United States v. Curry*, 965 F.3d 313 (4th Cir. 2020); *See, e.g., Kentucky v. King*, 563 U.S. 452, 460, 131 S.Ct. 1849, 1856, 179 L.Ed.2d 865 (2011) (recognizing warrantless entry is permitted to prevent the destruction of evidence); *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 1947, 164 L.Ed.2d 650 (2006) (recognizing warrantless entry is permitted "to render emergency assistance to an injured occupant or to protect an occupant from imminent injury"); *United States v. Santana*, 427 U.S. 38, 42-43, 96 S.Ct. 2406, 2409–10, 49 L.Ed.2d 300 (1976) (recognizing that officers may enter the curtilage and even a home without a warrant when in "hot pursuit" of a suspect). To determine whether exigent circumstances justified an officer's actions, a court must determine whether a "now or never" situation actually existed by analyzing "the totality of the circumstances confronting the officer as he decides to make a warrantless entry." *Lange v. California*, 141 S. Ct. 2011, 2018; *Riley v. California*, 573 U.S. 373, 391 (2014).

18

Courts have found that officers may conduct a warrantless entry of one's home to render emergency assistance, prevent imminent harms of violence, destruction of evidence, or a fleeing suspects escape from the home. *See id.* at 2017, 2024. However, "in misdemeanor cases, flight does not always supply the exigency that [the Supreme Court] has demanded for a warrantless home entry." *United States v. Santana*, 427 U.S. 38, 42–43 (1976) (unlike the hot pursuit of a fleeing felon, which is itself an exigent circumstance, the "flight of a suspected misdemeanant does not always justify a warrantless entry into a home."). In *U.S. v. Santana*, the Supreme Court held that the act of retreating into one's house cannot defeat an arrest that had been "set in motion in a public place." 427 U.S. 38 (1976). However, *Santana* is premised on police pursuit of a felony suspect and leaves open several questions regarding police pursuits of fleeing misdemeanants.

Later in *Lange,* the Supreme Court found "that when a minor offense alone is involved, police officers do not usually face the kind of emergency that can justify a warrantless home entry." *See Lange*, 141 S.Ct. at 2020. Although a misdemeanant's flight may create a need for police to act swiftly in some cases, "no evidence suggests that every case of misdemeanor flight poses such dangers . . . Those suspected of minor offenses may flee for innocuous reasons and in non-threatening ways." *Id.* at 2021 (citing *Mascorro v. Billings*, 656 F.3d 1198, 1201 (C.A. 10 2011). For instance, in *Mascorro*, a teenager who was "driving without taillights" did not stop upon seeing a police signal to pull over and drove two blocks to his parents' house, ran inside the home, and hid in the bathroom. *Id.* (citing *Mascorro*, 656 F.3d at 1202). In analyzing the facts in *Mascorro*, the Supreme Court found that waiting to get a warrant in non-emergency situations is "unlikely to hinder a compelling law enforcement need." *Id.* The Court also explained that non-emergency situations present circumstances where the risk of flight or escape is somewhere between low and non-existent, there is no evidence that has the potential to be destroyed, and there are no officer or public safety concerns. *Id.* These cases are not only atypical but also in stark contrast to emergency situations where there is risk of "imminent harm to others, a threat to the officer himself, destruction of evidence, or escape from the home," all of which present an exigency that would allow officers to conduct a warrantless intrusion. *Id.*

19

Here, the Court has reviewed the particular facts of the case to determine whether the Officers' misdemeanor pursuit involved exigencies allowing them to enter the Defendant's curtilage without a warrant. *U.S. v. Welsh*, 466 U.S. at 753. ("The gravity of the underlying offense…is an important factor to be considered when determining whether an exigency exists."). The burden is on the Government to prove that an exigency justified the Officers' warrantless entry under the circumstances. In support of its position, the Government argues that the Defendant's four attempts to avoid the Officers create exigent circumstances that were "much more involved than Maxwell simply refusing to stop for a traffic stop and walking to his front door because it involves additional suspicious behavior by [Defendant] from the first instance he spotted" Cpl. Thacker's patrol vehicle. Resp. Opp. at 9. Additionally, the Government contends that the Defendant's actions led the Officers to believe that there could be imminent harm to whoever was behind the locked door of 196 Langley Avenue (Defendant's duplex), destroyed evidence, and general suspicions that the Defendant may be involved in more serious criminal activity. *Id.* at 10.

Under the facts, it is difficult to find that there was an exigency that justified Cpl. Thacker's warrantless intrusion. The Court finds that the potential for harm to the Officers, or others, was minimal because no apparent officer or public safety concerns existed. In addition, the Defendant's risk of flight or escape upon entering his home was somewhere between low and nonexistent. With the exception of Cpl. Thacker's description of the Defendant's unusual gait and running stride after the Defendant exited his vehicle, there is no evidence to suggest that the Defendant was armed or dangerous. Finally, there is no suggestion that the Defendant could have destroyed any evidence of the underlying offense, given the fact that the unregistered vehicle with an improperly displayed license plate remained parked outside of the duplex when the Officers seized the Defendant. The Court does not ignore the fact that the Defendant's decision to flee from police, both in a vehicle and on foot, was not cooperative and his conduct made their duties more difficult. However, even with these facts, the Defendant's actions do not create an exigency because the officers had no reason to suspect that the Defendant was engaged in any felonious conduct. Accordingly, the Officers' decision to seize the Defendant in his curtilage was not based on any "real immediate and serious" threat that prevented them from postponing their actions to obtain a warrant. *Lange*,

141 S.Ct. at 2022 ("When the nature of the crime, the nature of the flight, and surrounding facts present no such exigency, officers must respect the sanctity of the home – which means they must get a warrant.").

In holding that the circumstances presented in this case did not create an exigency to justify the Officers' warrantless entry into the Defendant's curtilage, the Court emphasizes that its decision is a narrow one. Like *Lange*, this decision does not stand for the proposition that an officer's pursuit of every fleeing misdemeanant is frivolous or in violation of the Fourth Amendment. In addition, the Court notes that it is not adopting a blanket prohibition on an officer's entry into a home's curtilage for legitimate and reasonable purposes. Notwithstanding the above, the facts and circumstances reviewed here preclude the Court from finding that the manner in which the Officers seized the Defendant complied with the Fourth Amendment. Cpl. Thacker violated the Defendant's Fourth Amendment rights by trespassing on his curtilage to arrest the Defendant for a misdemeanor offense. Based on the totality of the circumstances, there was no exigency that permitted the Officers to enter the curtilage without a warrant. Absent an exception, the evidence obtained as a result of the Defendant's unlawful seizure must be suppressed. *See Davis v. United States*, 564 U.S. 229, 236 (2011); *Pennsylvania Bd. of Probation and Parole v. Scott,* 524 U.S. 357, 363, (1998) (holding that the exclusionary rule is a prudential rule created by this Court to "compel respect for the constitutional guaranty" and to deter Government violations) (internal citations omitted); *see also United States v. Calandra*, 414 U.S. 338, 347–48 (1974).

## VI.   CONCLUSION

For the foregoing reasons, the Defendant's Motion to Suppress, ECF No. 16, is **GRANTED**, and all evidence obtained from the unlawful seizure is **SUPPRESSED.**

The Clerk is **DIRECTED** to send a copy of this Order to the United States Attorney and Defendant.

**IT IS SO ORDERED.**

Newport News, Virginia
April 6 , 2023

Raymond A. Jackson
United States District Judge